151 P.3d 802

**STATE of Hawai'i, Petitioner/Plaintiff–Appellee**

**v.**

**Louis Kruse AGARD IV, Respondent/Defendant–Appellant.**

**No. 27219.**

Supreme Court of Hawai'i.

Jan. 23, 2007.

Anne K. Clarkin, Deputy Prosecuting Attorney, City & County of Honolulu, on the application for Petitioner/Plaintiff–Appellee State of Hawai'i.

Deborah L. Kim, Deputy Public Defender, on the response for Respondent/Defendant–Appellant Louis Kruse Agard IV.

MOON, C.J, LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

Petitioner/Plaintiff-Appellee State of Hawai'i (Petitioner) filed an application for writ of certiorari [1] on December 12, 2006, requesting that this court review the August 15, 2006 Summary Disposition Order (SDO) of the Intermediate Court of Appeals (the ICA),[2] reversing the January 21, 2005 judgment of the district court of the first circuit (the court) [3] adjudging Respondent/Defendant–Appellant Louis Kruse Agard IV (Respondent) guilty of Reckless Driving, Hawai'i Revised Statutes (HRS) § 291–2 (Supp. 2006).[4] Respondent filed his response to Petitioner's application on December 27, 2006.

We hold that (1) the reckless state of mind definition under HRS § 702–206(3) (1993) applies to the reckless driving statute, HRS § 291–2; (2) in determining whether an identified risk is substantial and unjustifiable under HRS § 702–206(3), the nature and degree of the risk disregarded by the actor, the nature and purpose of his conduct, and the circumstances known to him in acting must be weighed; (3) in this case a reckless state of mind can be inferred from the circumstances to conclude that there was conscious awareness of a substantial and unjustifiable risk to the safety of others and property on the part of Respondent; and (4) deference must be given to the trier of fact with respect to questions of credibility and weight of the evidence. Therefore, there was substantial evidence for the court to find Respondent guilty of reckless driving in violation of HRS § 291–2. Because the ICA reversed the court's judgment, the ICA's August 15, 2006 SDO is reversed, and the court's January 21, 2005 judgment is affirmed.

## I.

The relevant procedural history obtained from the application is as follows.

On December 21, 2004, [Respondent] was ... charged with Operating a Vehicle in Reckless Disregard of the Safety of Persons or Property in violation of [HRS] § 291–2....

Following a bench trial, Respondent was found guilty[.] ... [S]entence was stayed pending appeal.

Respondent ... appeal[ed] ... on February 18, 2005. On appeal, Respondent ... claim[ed] insufficiency of the evidence [on the ground] that the evidence ... failed to prove beyond a reasonable doubt that [Respondent] acted with ... "the requisite reckless state of mind[.]"

In its August 15, 2006 SDO, the ICA described the circumstances giving rise to the charge as follows:

On July 18, 2004, after midnight on the H-3 Freeway, as [Respondent] drove eastbound through the tunnels toward the Kahekili Highway exit, he was "lasered" by a police officer as going 80 miles per hour [ (mph) ] in a 55 [mph] zone, changed lanes to pass other vehicles, turned on the Likelike Highway exit, swerved in front of the police officer's vehicle, turned on the Kahekili Highway exit, exited Kahekili Highway, ran through a stop sign, swerved into

---

1. Pursuant to Hawai'i Revised Statutes (HRS) § 602–59 (Supp.2006), a party may appeal the decision of the intermediate appellate court (the ICA) only by an application to this court for a writ of certiorari. *See* HRS § 602–59(a). In determining whether to accept or reject the application for writ of certiorari, this court reviews the ICA decision for:

 (1) Grave errors of law or of fact; or
 (2) Obvious inconsistencies in the decision of the [ICA] with that of the supreme court, federal decisions, or its own decision,

 and the magnitude of such errors or inconsistencies dictating the need for further appeal. HRS § 602–59(b). The grant or denial of a petition for certiorari is discretionary with this court. *See* HRS § 602–59(a).

2. The Summary Disposition Order was issued by Chief Judge James S. Burns, and Associate Judges Daniel R. Foley and Alexa M. Fujise.

3. The Honorable Michael Marr presided.

4. HRS § 291–2 entitled, "Reckless driving of vehicle or riding of animals; penalty" states:

 *Whoever operates any vehicle or rides any animal recklessly in disregard of the safety of persons or property is guilty of reckless driving of vehicle or reckless riding of an animal, as appropriate, and shall be fined not more than $1,000 or imprisoned not more than thirty days, or both.*
 (Emphases added.)

an oncoming lane, and finally stopped at a residence.

SDO at 1.

At trial Respondent "denied driving ... the morning of July 18, 2004, and stated that the car was either in his yard during the incident or in the possession of one of his family [members] or friends, all of whom denied responsibility for the incident." According to the court, however, it found "unbelievable [the] testimony of [Respondent] and defense witness, Kenneth Friedman[,]" and that Petitioner "had proved its case beyond a reasonable doubt and found [Respondent] guilty of reckless driving."[5] Nevertheless, the ICA concluded that

> [Petitioner] failed its burden of proving that, considering the nature and purpose of his conduct and the circumstances known to him, [Respondent] consciously disregarded a substantial and unjustifiable risk that one or more persons would be injured and/or that property would be damaged and the disregard of this risk involved a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.

SDO at 3. It therefore reversed Respondent's January 21, 2005 judgment of conviction.

## II.

■ In its application, Petitioner poses the following question: "Whether the ICA erred in concluding that the combined actions of speeding at 80[mph] in a 55 mph zone, multiple unsafe lane changes, failure to stop for a pursuing police vehicle, cutting off a motor vehicle by swerving directly in front of it and disregarding a stop sign was insufficient evidence to support a conviction for reckless driving?" (Capitalization omitted.) Petitioner argues that the ICA erred in answering the question in the affirmative.

In response, Respondent argues that "while the evidence showed that [Respondent] committed various non-criminal traffic infractions, [Petitioner] failed to adduce facts establishing that [Respondent] drove his vehicle with the requisite criminal state of mind

of 'reckless.' " Specifically, Respondent argues that (1) "[t]he record shows that while [Respondent's] violation of various traffic offenses may have posed some degree of risk of harm to others, it cannot be concluded that there was a substantial risk to the safety of others," and (2) "[a]ssuming that there was some evidence that [Respondent's] operation of his vehicle presented a substantial risk to persons or property, under the circumstances of this case, it cannot be concluded that there was sufficient evidence that [Respondent] was subjectively aware of such a risk, and thus, acted in conscious disregard of the risk."

## III.

In pertinent part, HRS § 291–2 states that "[w]hoever operates any vehicle ... recklessly in disregard of the safety of persons or property is guilty of reckless driving...." "Recklessly" is not defined in the statute. In their Opening and Answering Briefs respectively, Respondent and Petitioner resort to HRS § 702–206(3) entitled, "Definitions of states of mind, which states in relevant part:

> (a) *A person acts recklessly* with respect to his conduct *when he consciously disregards a substantial and unjustifiable risk* that the person's conduct is of a specified nature.
>
> ....
>
> (d) *A risk is substantial and unjustifiable ... if,* considering the nature and purpose of the person's conduct and the circumstances known to him, *the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.*

(Emphases added.) HRS § 701–102(3) (1993), entitled, "All offenses defined by statute; applicability to offenses committed after the effective date," states, "The provisions of chapters 701 through 706 of the Code *are applicable to offenses defined by other statutes,* unless the Code otherwise provides." (Emphasis added.) Because HRS § 702–206(3) is a provision included within HRS

---

5. Petitioner points out that "Respondent's defense did not dispute that [Petitioner's] evidence was sufficient to prove reckless driving, but that he had not been the driver of the vehicle."

chapters 701 and 706, and the Code does not provide otherwise, the state of mind definition in HRS § 702–206(3) applies to HRS § 291–2. *See State v. Kupihea,* 98 Hawai'i 196, 201 n. 8, 46 P.3d 498, 503 n. 8 (2002) (concluding that, based on HRS § 701–102(3), "the provisions of the [Code], such as HRS §§ 702–202 and –204 [ (1993) ], are applicable to HRS § 329–43.5 [ (1993) ]," a statute not part of the Code).

Petitioner also cites to the Commentary on HRS § 702–206 which states in relevant part:

Recklessness in subsection (3) deals not with the conscious object of conduct or the relative certainty of conduct but rather with disregard of certain probabilities. *Recklessness is the conscious disregard of a known risk.* It goes without saying that the conscious disregard of every risk of harm to a protected social interest should not, in every instance, be sufficient to impose penal liability for an untoward eventuality. Precision in defining which risks the penal law will not let a defendant ignore is impossible. Following the lead of the Model Penal Code, the Code has labeled the relevant risks as "substantial and unjustifiable" and in subsection (3)(d) states the factors which ought to be considered in determining whether the disregard of the risk should be condemned. The Reporter to the Model Penal Code has stated the issue concisely:

The draft requires, however, that the risk thus consciously disregarded by the actor be "substantial" and "unjustifiable"; even substantial risks may be created without recklessness when the actor seeks to serve a proper purpose, as when a surgeon performs an operation which he knows is very likely to be fatal but reasonably thinks the patient has no other, safer chance. Accordingly, to aid the ultimate determination, the draft points expressly to the factors to be weighed in judgment: *the nature and degree of the risk disregarded by the actor, the nature and purpose of his conduct and the circumstances known to him in acting.*

(Quoting Model Penal Code, Tentative Draft No. 4, comments at 125 (1955) (emphases added)).

### IV.

 It should be noted initially that "[t]he test on appeal in reviewing the legal sufficiency of the evidence is whether, when viewing the evidence in the light most favorable to the prosecution, substantial evidence exists to support the conclusion of the trier of fact." *State v. Bui,* 104 Hawai'i 462, 467, 92 P.3d 471, 476 (2004) (citing *State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995)). "Substantial evidence" means " 'credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to reach a conclusion.' " *Id.* (quoting *State v. Silva,* 75 Haw. 419, 432, 864 P.2d 583, 590 (1993) (internal ellipses, brackets, and citations omitted)).

██ Furthermore, "appellate courts will give due deference to the right of the trier of fact 'to determine credibility, weigh the evidence, and draw reasonable inferences from the evidence adduced.' " *In re Doe,* 107 Hawai'i 12, 19, 108 P.3d 966, 973 (2005) (quoting *State v. Lubong,* 77 Hawai'i 429, 432, 880 P.2d 766, 769 (App.1994) (citation omitted)). As to a defendant's state of mind, this court has said, "Given the difficulty of proving the requisite state of mind by direct evidence in criminal cases, proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the defendant's conduct is sufficient." *State v. Eastman,* 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996) (citation omitted).

### V.

Although Petitioner cites to other reported reckless driving cases, such cases revolve around the specific facts in those cases. Here, according to Petitioner,

[t]here [was] . . . speeding (25 miles over the posted speed limit), . . . multiple unsafe lane changes, swerving into an oncoming lane of traffic, refusal to stop for a police officer, cutting in front of other vehicles, passing on the right, . . . [and] running a stop sign.

Honolulu Police Officer Michael. R. Krekel (Officer Krekel) testified that on July 18, 2004, while performing traffic enforcement outside the H–3 eastbound tunnel, he used an ultralight laser to detect Respondent traveling at 80 mph, twenty five miles over. the posted speed limit. Thereafter, Officer Krekel stated that he followed Respondent and testified to the following:

[OFFICER KREKEL]: (Inaudible) right here. Lasered the vehicle here. I'm right here in front (inaudible) gates surround. I got in my vehicle. I followed the vehicle. At this time the vehicle was halfway between the (inaudible) tunnel and the (inaudible). *The vehicle, still in the left lane, merged over into the right lane and then crossed back over between two vehicles. And as it got past the second vehicle here, it merged back into the right lane just past the (inaudible) tunnel.*

I was unable to pace the speed of the vehicle. It just (inaudible) usually past these vehicles, continued on in the right lane. I didn't catch up to the vehicle until just prior to the Likelike off-ramp. I was approximately four car lengths behind the vehicle. At this point right here, you see, what I do is when I laser (inaudible) tunnel I stop vehicles in a safe location to the shoulder here just prior to the (inaudible). Just prior to this (inaudible) right here I turned on my lights and siren.

. . . .

[PETITIONER'S COUNSEL] Q And during the course of this following the defendant did you at any time see the defendant turn on his blinker when he changed lanes to (inaudible)?

[OFFICER KREKEL] A (Inaudible.)

Q And what happened after?

A *The vehicle came around. There were no other vehicles. (Inaudible) came back on to or came onto this right here, circled around onto the Likelike Highway Kaneohe bound. The vehicle then came into the center lane here, went to the far left lane to observe the driver. At that point (inaudible) the driver was impaired.* He appeared to look in his rear view mirror which is somewhat common on the freeway because you're not going to hear a

siren traveling 25 or 45 or a higher speed. (Inaudible) a siren. Actually here [sic] the siren and (inaudible).

. . . .

A ... *I approached the car on the right side of the vehicle, and we (inaudible) the vehicle past [sic].* Even though I had my lights, my directional signal on, the cars (inaudible) right lane, it's unsafe for any other person standing on the other side, person on the right side. If they're this side here of the retainer wall, (inaudible).

. . . .

A ... This is where I put on my lights and siren. And as we came onto this—to Likelike Highway to the left lane I again hit my lights and siren. *While I was in this position the vehicle then came around this vehicle. That was the only vehicle. It passed in front of us, came into the far right lane, and then actually cut off, swerved right in front of me.*

Q You stated that you weren't successful in (inaudible)?

A Yeah. I wasn't—I wasn't—

Q But did you look at your speedometer to see how fast you were driving?

A No, I wasn't because I actually had the initial violation. Normally what you do in a case like this, um, since that's normally what I do, (inaudible) is to observe violations. But probable cause was already met here and here, here. But at this point right here my main concern is (inaudible) stop actually here that he was going to pull over at this point. And then as he got into this lane right here, it was 45[mph]. I didn't (inaudible).

. . . .

A *He cut off his vehicle here and then merged into the left turn lane (inaudible).*

. . . .

A The vehicle just continued on here. I had to catch up with the vehicle. Swing by (inaudible) here. I was not able to (inaudible).

. . . .

Q Did you have to speed up to catch up with the [Respondent]?

A Yes. As he turned around his vehicle to me, it's (inaudible).

Q How about during the course of the (inaudible) tunnel and Likelike off-ramp? Did you find you had to speed up to catch up with the [Respondent]?

A I had to speed up to get to this point (inaudible), and then as he got into this lane right here, it's 45[mph] here, but I didn't (inaudible).

Q What happened?

A He got out of his vehicle here and then merged into the left-turn lane on Kahekili off-ramp.

. . . .

A Uh, the vehicle just continued on here. Then again I was unable to catch up to the vehicle. . . .

. . . .

Q What happened after the Kahekili off-ramp?

A . . . *The vehicle came into the left turn lane. This is (inaudible) you cross. The first lane is (inaudible). The light was green and he slowed down. I don't remember the vehicle sitting there braking for a very long time. Might have been 30 seconds.* That's when I started running the plate of the vehicle.

. . . .

A *Um, at that point I—you know, I was thinking, well, maybe this isn't a drunk driver. May this is a stolen vehicle or (inaudible) at this point a stolen vehicle.* I ran the plates. I didn't get a feedback from the police dispatch until this point up here before he came out of this private lane right here.

And the report came back, um—the dispatcher said it was registered to an Agard, and she gave this street right here Kahulukiu. And when I came up here, I saw the numbers on the side, the numbers on the side of the house right here. So I knew that would be (inaudible) residence.

. . . .

A *As I hit my blue lights, again (inaudible) it turn right here to stop this vehicle. Um, the vehicle then sped up, ran through this stop sign right here, ran through the stop sign, swerved into the oncoming lane here, and came out at a high rate of speed. Actually it turns then scraped or turned to the left (inaudible).*

Q *Did you see the [Respondent] pause at the stop sign?*

A *No, there was no pause, just continuous motion. And he accelerated (inaudible).*

Q And what happened after the turn?

A *The vehicle actually sped up, and I was behind the vehicle, six, seven car lengths behind.* I lost sight of the vehicle as it pulled into this private lane. There's a house here. As I turned right here, I saw the brake lights come, and I saw the vehicle stop right in the carport area essentially right here.

Q You say you lost sight of the vehicle?

A I lost sight of the vehicle for a few seconds.

Q And when you caught up with the vehicle, was it the same?

A As I caught up with the vehicle, it was the same as this. There were several other vehicles that were parked. The head lights were still on in the vehicle, and the driver was still seated in the driver's seat.

. . . .

A Uh, right then and there I gave a—I looked—I put on my flood lights, overhead lights. And also there's a house right here, so I turned on my side lights right here for safety. . . .

. . . .

A . . . *I stood right outside the open door [of my vehicle] and, uh, for quite a few minutes I might have been in between (inaudible). As [Respondent] exited the vehicle, opened the door, he exited the vehicle. He came around to this side right here. And I gave the driver several commands, identified myself as a police officer, told him to stop quite a few times.*

. . . .

Q So was your light on, your lights on?

A Uh, yes. The back ones are. What I do is (inaudible) heavy metal lights are flashing (inaudible). And I (inaudible) right here because I have flood lights on.

Q Did the flood lights provide you with sufficient lights to see—

A Yes.

. . . .

Q When the [Respondent] was in his car did you get a look at him?

A Yes, I did.

Q And when the [Respondent] exited his car did you get a look at him then?

A Yes, I did.

Q And approximately how far away were you from the [Respondent]?

A Uh, approximately 25 feet.

Q When you called out to the [Respondent], what did [Respondent] do?

A Nothing. He just closed his door. He walked straight over here kind of like a carport area, covered right here. He walked up to the front door. There were lights in the house. He then opened the door. I called out to him three times Police. Stop. Police. Stop. Police. Stop."

Q Were you walking towards him when you said these words?

A I was walking, yes. I was right here. Uh, the individual entered the house, closed the door. Officer Moy pulled up. I saw his headlights and his cruise lights. And, uh, I ran up to the door, knocked on the door, and I was there for approximately five minutes tapping on the window and the door. And the lights were still out.

Q *All right. So you were calling out to the defendant and told him to stop?*

A *Yes.*

Q All right. Did he look at you?

A *No.*

Q *He didn't respond to you in any way?*

A *No.*

Q Were you able to see his face?

A Yes.

Q Did you have a—

A Yes, I did. He was staring at the house. His body was very rigid, and his eyes appeared very glassy. And he was, like, staring at the house, walked straight from his car. He just walked in a straight line (inaudible).

Q And then what happened when the [Respondent] entered his home?

A I knocked on the door. No one came out. My sergeant, my supervisor, came to the scene.

. . . .

A ... I was instructed by my supervisor Sergeant Dowkin to cite for reckless— after I advised him, to cite for reckless driving and no insurance.

(Emphases added.) Petitioner asserts that Respondent "exhibited consciousness of his guilt by his refusal to stop, when [the o]fficer ... pursued him with sirens blaring and lights flashing."

## VI.

In his Opening Brief on appeal, Respondent asserted that to be convicted of reckless driving, his conduct must have created "a high probability" of the prescribed harm.

> By definition, the degree of risk of harm posed by the actor must arise to *substantial risk*, such that disregard of the risk amounts to a *gross deviation* from the ordinary standard of care. Evidence based merely upon speculation, or which establishes the possibility that the harm sought to be prevented would occur, does not suffice as proof of a substantial risk. Evidence of a substantial risk requires proof that the actor's conduct creates a *high probability* that such harm would occur.

(Emphases in original.) To support his argument, Respondent cites *Commonwealth v. Bullick,* 2003 PA Super 285, 830 A.2d 998 (2003), in which the Pennsylvania Superior Court considered the state of mind requisite to conviction of reckless driving in "willful or wanton disregard of safety of persons or property" as synonymous with the definition of recklessness based on "conscious disregard of substantial and unjustifiable risk." *Id.* at 1002. In that case, it was determined

> that the *mens rea* necessary to support the offense of reckless driving is a requirement that [the driver] drove in such a manner that there existed a substantial risk that

injury would result from his driving, i.e., a high probability that a motor vehicle accident would result from driving in that manner, that he was aware of that risk and yet continued to drive in such a manner, in essence, callously disregarding the risk he was creating by his own reckless driving.

*Id.* at 1003.

Respondent maintained that, "[w]hile the record shows that [Respondent's] driving may have posed some degree of risk of harm to others, it cannot be concluded that there was a high probability of such a risk." He, however, summarizes the circumstances surrounding his alleged conduct as follows:

Officer Krekel's testimony in the light most favorable to [Petitioner] showed [Respondent] drove under the following relevant conditions. 1) It was 12:28 a.m. on the H3 freeway exiting the tunnel. 2) Traffic was very light. When Officer Krekel first cited [Respondent], his was the lone vehicle in the left lane of the freeway. Officer Krekel described [Respondent] passing less then half a dozen other automobiles. *3) [Respondent] was traveling 80 mph as he exited the tunnel in a 55 mph zone. [4) Respondent] changed lanes twice to pass other vehicles. [5) Respondent] swerved into an "oncoming lane" at high speed, and [6) Respondent] disregarded two stop signs.*

(Emphasis added.) Respondent argues that:

The circumstances described by Officer Krekel—the very light traffic and the early morning hour, show that although [Respondent] committed a number [of] traffic infractions, *there was no evidence that any other persons were endangered by his driving.* Officer Krekel testified that [Respondent] executed quick lane changes to pass other vehicles traveling in the same direction. However, there is no evidence that these maneuvers in any way impeded or interrupted the forward movement of the other cars. There is no evidence that [Respondent] drove too close to the other cars, or cut them off, or caused them to brake or swerve. There is no evidence that [Respondent's] driving in any way impacted the other vehicles on the road.

The same is true of the other instances of lane changes on the Kahekili [H]ighway and disregarding the stop signs. *Where there are no other vehicles or persons in the area, such conduct does not create a substantial risk, or high probability, of harm or injury.*

(Emphases added.)

The standard of a "high probability" of risk of an accident is not contained in HRS § 291-2 and, thus, is not binding in this jurisdiction. Nevertheless, the definition of reckless conduct as set forth in HRS § 702-206 is similar. In that regard, the "reckless" standard is not to be indiscriminately applied, for "the conscious disregard of every risk of harm to a protected social interest should not, in every instance, be sufficient to impose penal liability for an untoward eventuality." Commentary on HRS § 702-206. The probable likelihood of an accident paradigm, however, is embodied in the requirement under HRS § 702-206(3) that the culpable risk is one that must be "substantial and unjustifiable." In assessing whether an identified risk meets these criteria, the Commentary on HRS § 702-206 "points expressly to the factors to be weighed in judgment: the nature and degree of the risk disregarded by the actor, the nature and purpose of his conduct and the circumstances known to him in acting." (Citation omitted.) Hence, the "substantial and unjustifiable" standard is essentially equivalent to the high probability standard and the governing statute establishes the factors to be applied in arriving at the relevant conclusion.

## VII.

The circumstances surrounding Respondent's alleged conduct indicate that Officer Krekel observed Respondent traveling at 80 mph in a 55 mph zone, that Respondent passed about six other vehicles, changed lanes twice to pass the other vehicles, swerved into an oncoming lane at a high speed, and disregarded two stop signs. On the face of it Respondent's own rendition of his conduct emphasized above, indicates evidence of acts which, taken together, would enable a reasonably cautious person to believe the safety of other persons and proper-

ty then on the highway was put at "substantial and unjustifiable risk." HRS § 702-206(3). Thus, taking the evidence in the strongest light for the Petitioner, the evidence was of sufficient quality and probity to enable a reasonably cautious person to conclude that Respondent disregarded the safety of persons or property, *Bui*, 104 Hawai'i at 467, 92 P.3d at 476 (citations omitted), and that such circumstances, *Eastman*, 81 Hawai'i at 141, 913 P.2d at 67, reasonably demonstrate that Respondent's disregard of the risk to others was conscious and "involve[d] a gross deviation from the standard of conduct that a law abiding person would observe in the same situation,"[6] HRS § 702-206(3)(d). Moreover, deference must be given to the court, which was the trier of fact, with respect to questions of credibility and weight of the evidence. *In re Doe*, 107 Hawai'i at 19, 108 P.3d at 973. In reversing the court it does not appear that the ICA applied the foregoing governing standards.

## VIII.

Therefore, the August 15, 2006 SDO of the ICA is reversed and the January 21, 2005 judgment of the court is affirmed.

6. As to the reckless component of the charge, Petitioner contends,

> There is little doubt that a law abiding person would recognize that possible repercussions of *traveling at 80 mph in a tunnel where the speed limit was 55 mph would include the high probability of an accident should [Respondent] lose control of the vehicle.* Similarly, such a citizen could ascertain that *weaving in and out of traffic without signaling, and changing lanes abruptly cutting off a police vehicle (or any vehicle) while simultaneously exceeding the speed limit would entail a markedly higher risk of accident or injury.* Such actions singly, but certainly in combination involve a gross deviation from the standard of care that a normal law abiding person would observe in the same situation.

(Emphases added.)