155 P.3d 1102

**STATE of Hawai'i, Plaintiff–Appellee**

v.

**Pame Ann Mary Leilani ROMANO, Defendant–Appellant.**

No. 26110.

Supreme Court of Hawai'i.

Feb. 27, 2007.

As Amended March 30, 2007.

**2**

William A. Harrison (Harrison & Matsuoka), on the briefs, Honolulu, for defendant-appellant.

Daniel H. Shimizu, Deputy Prosecuting Attorney, City & County of Honolulu, on the briefs, for plaintiff-appellee.

MOON, C.J., NAKAYAMA, ACOBA, and DUFFY, JJ.; and LEVINSON, J., Dissenting.

Opinion of the Court by ACOBA, J.

We hold that Defendant–Appellant Pame Ann Mary Leilani Romano (Defendant) has not established, as she argues on appeal, that (1) "[Plaintiff–Appellee State of Hawai'i (the prosecution) ] failed to support a prima face [sic] case of prostitution because the [prosecution] failed to prove ... that Defendant was not a law enforcement officer," (2) "the [prosecution] failed to present sufficient evidence to support a prima face [sic] case of prostitution," (3) "there was insufficient evidence adduced to support a finding of guilt," and (4) "*Lawrence v. Texas*[, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003),] renders Hawai'i Revised Statutes [ (HRS) ] § 712–1200 et seq. unconstitutional as applied in this case." (Capitalization omitted.) Therefore, Defendant's August 26, 2003 judgment of conviction and sentence by the district court of the first circuit (the court) [1] for the offense of prostitution, HRS § 712–1200(1) (Supp.2006),[2] is affirmed.

## I.

### A.

Trial began on August 13, 2003, and the evidence following was adduced. On January 18, 2003, Officer Jeffrey Tallion was on duty with the Narcotics/Vice Division of the Honolulu Police Department Morals Detail. He testified he was on assignment investigating prostitution in the Waikīkī area. Tallion related that the investigations involved "checking into hotel rooms and then ... either go[ing] on to the street or ... set[ting] up appointments either in the telephone book or 'Pennysaver,' 'Midweek,' or internet cases."

In preparation for his undercover operation, Tallion obtained a hotel room at the Aston Waikiki Beach Hotel and dressed in civilian clothes. He browsed through the "Pennysaver" newspaper and called the phone number on a massage advertisement. When Defendant answered the phone call, Tallion asked if she did "out calls." At this time, there was no discussion of any illicit conduct or sexual acts.

Tallion set up an appointment with Defendant and they met on the street in front of the Aston Waikiki Beach Hotel, but then moved to Tallion's hotel room. In court, Tallion positively identified Defendant as the individual he met outside on January 18, 2003.

Upon arriving in the room, Tallion confirmed that the price of an out call was $100 and then asked Defendant whether "she did anything else." Defendant responded, "Like what? Dance?" Tallion responded, "No," so Defendant asked, "Well, what do you have in mind?"

Tallion then answered, "Well, I was referring to a blowjob." [3] Defendant replied, "No, hands only." Tallion clarified, "So no blowjob, so handjob." Defendant responded, "Yeah, I can do that." Tallion asked the cost and Defendant responded, "Add 20." Tallion reconfirmed with, "Oh, $20 for a handjob?" and Defendant replied, "Yes." Tallion testified that a handjob is street vernacular commonly used in prostitution for "assisted masturbation."

Following Defendant's reply, Tallion "gave a pre-determined signal" and the arrest team

---

1. The Honorable Faye Koyanagi presided.

2. HRS § 712–1200(1) states that "[a] person commits the offense of prostitution if the person engages in, or agrees or offers to engage in, sexual conduct with another person for a fee." HRS § 712–1200(2) defines "sexual conduct," *inter alia*, as "sexual contact." HRS § 707–700 (1993) defined sexual contact as:

 [A]ny touching of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

The definition of sexual contact in HRS § 707–700 was amended in 2004, *see* Haw. Sess. L. Act 61, § 3 at 303, by adding the phrase "other than acts of 'sexual penetration' " after "any touching" in the first sentence. The amendment does not affect our analysis in this case.

3. In *State v. Lunceford*, 66 Haw. 493, 496–97, 666 P.2d 588, 591 (1983), this court said the term "blowjob" is "recognized by a large segment of the adult population in Hawaii as [an expression] describing sexual conduct in slang" and the term could be found in *The American Heritage Dictionary of the English Language* under both "blow job" and "fellatio."

**4**

entered the hotel room. Tallion apprised Honolulu police officer William Lurbe of the facts and Lurbe placed Defendant under arrest.

Tallion testified that he had been with the Morals Detail for three years; he was involved in 400 prostitution cases in 2002 as either the undercover or arresting officer; maybe five of the prostitution cases were initiated from "Pennysaver" ads; and after the talk about "handjob," Defendant added $20.00 to her quoted $100.00 charge for the out-call service. On cross-examination, Tallion recounted that he found Defendant's advertisement in "Pennysaver's" Massage/Acupuncture Section and not the Adult Section. He also related that "hands only" could have meant what a masseuse actually does.

In his testimony, Lurbe testified that he arrested Defendant for prostitution on January 18, 2003, after being "informed by [Tallion] that he [had] obtained a prostitution violation from [Defendant], which was assisted masturbation for $20." On cross-examination, Lurbe indicated that Tallion notified him of the violation via cellular phone.

Following Lurbe's testimony, the prosecution rested. Defendant moved for a continuance "to subpoena, investigate and talk to witnesses who were in the room adjoining this, this room." Over the prosecution's objection, the court continued the case to August 26, 2003.

### B.

On August 21, 2003, Defendant filed a "Motion to Dismiss." In the memorandum attached to the motion, Defendant asserted that *Lawrence* "invalidate[d] Hawaii's prostitution statutes [and] thus[,] the [prosecution's] case [against Defendant] must necessarily fail."

At the start of the proceedings held on August 26, 2003, Defendant moved for a judgment of acquittal, arguing that the prosecution had failed to prove (1) that there was an offer and agreement to engage in sexual conduct for a fee; and (2) that Defendant was "not a police officer, a sheriff, works for the sheriff's department or law enforcement acting in the course or scope of her duties."

After hearing from the prosecution, the court denied Defendant's motion.

Defendant's "Motion to Dismiss" was then heard. The court denied the motion, stating that it "[did] not agree with the applicability of [*Lawrence* ] to the instant situation."

Defendant took the witness stand in her own defense and testified that she was a self-employed license massage therapist, she had been a licensed massage therapist for "19 years, going on 20" and her license was current and up-to-date on January 18, 2003. She testified that she placed her ad under the "Body, Mind and Spirit," "Massage," or "Health and Fitness" sections and not under the "Personal" or "Adult" sections.

Defendant also recounted that on January 18, 2003, Tallion immediately asked for a blow job when she entered the hotel room. She explained that she was "caught off guard" because she was "not the typical person that men want this from," as she was "overweight" and "old."

She reported that after Tallion asked for the "blow job," she put her hands up and stated, "Hey, I only do hands only." She also declared that she was shaking her head "no" at the same time. Defendant then indicated that Tallion repeated his question again and also asked how much it would cost. Defendant again said, "No, hands only." Defendant also maintained that Tallion was "loud," "demanding," and "boisterous."

After Defendant repeated "hands only" again, Tallion asked about handjobs. Defendant claims that she had no intent to commit any kind of sexual contact with Tallion. She explained that she only gave Tallion a figure of $20 because she felt threatened and because of Tallion's loud demands. She then testified about a 1983 incident where "[she] got beat up real bad by this person who [she] had gone to for a job for telephone soliciting."

On cross-examination, Defendant admitted that she "couldn't remember [the conversation between Tallion and herself] word for word." She also stated that Tallion did not block her way to the door leading to the hallway, Tallion did not tell her she could not leave the room, and she did not attempt to

use the telephone or walk out of the room. Furthermore, Defendant indicated that she said "yes" when Tallion asked for a handjob, she knew that handjob could mean assisted masturbation, she told Tallion that the handjob would cost $20.00 extra, and she said "yes" when Tallion reiterated $20.00 for a handjob. On redirect examination, Defendant claimed that she felt trapped because it was not her room, the room "didn't have much room in it," and "she was within arm's reach of [Tallion]."

Following Defendant's testimony, the defense rested. The court found Defendant guilty of the charged offense. Defendant was sentenced to six months' probation and fined $500.00. Judgment was entered on August 26, 2003. Imposition of sentence was continued for thirty days for perfection of appeal.

The court instructed the prosecution to prepare written findings of facts and conclusions of law. The "Findings of Fact, Conclusions of Law, and Order Finding Defendant Guilty After Jury–Waived Trial" were filed on September 26, 2003. Notice of appeal was filed on September 19, 2003.

## II.

■ As noted previously, Defendant raised four issues on appeal.[4] In regard to issue (1), an exception to the offense of prostitution applies under HRS § 712–1200(5) for "any member of a police department, sheriff or other law enforcement officer acting in the course of and scope of duties." *State v. Nobriga*, 10 Haw.App. 353, 357–58, 873 P.2d 110, 112–13 (1994), *overruled on other grounds by State v. Maelega*, 80 Hawai'i 172, 178–79, 907 P.2d 758, 764–65 (1995), is instructive. According to that case, "[t]he general and well-settled common law rule is that where an exception is embodied in the language of the enacting clause of a criminal statute, and therefore appears to be an integral part of the verbal description of the offense, the burden is on the prosecution to negative that exception, prima facie, as part of its main case." *Id.* at 357, 873 P.2d at 112–13 (footnote and citation omitted). The Intermediate Court of Appeals (the ICA) further noted that "when the exception appears somewhere other than in the enacting clause, and is thus a distinct substantive exception or proviso, the burden is on the defendant to bring forward evidence of exceptive facts that constitute a defense" and, in such an instance, "[t]he prosecutor is not required … to negative, by proof in advance, exceptions not found in the enacting clause." *Id.* at 358, 873 P.2d at 113 (citations omitted).[5]

In *Nobriga*, the defendant was cited under Revised Ordinances of Honolulu (ROH) § 7–2.3 (1990),[6] "Animal nuisance," for keeping numerous roosters at his home. *Id.* at 355, 873 P.2d at 112. At trial, the defendant

4. The prosecution answered (1) the prosecution did not have to prove that Defendant was a law enforcement officer acting in the course and scope of her duties, (2) there was sufficient evidence adduced at trial to support Defendant's prostitution conviction, (3) Defendant failed to prove by a preponderance of the evidence that she acted under "duress" when she agreed to engage in sexual conduct with Tallion for a fee, and (4) Hawaii's prostitution statute is not rendered unconstitutional by *Lawrence*.

Defendant reiterated in her reply brief that the application of HRS § 712–1200 to this case was unconstitutional. We must note that it appears a substantial part of the reply brief corresponds *verbatim* to the published opinion of the New York City Family Court in *In re P.*, 92 Misc.2d 62, 400 N.Y.S.2d 455, 462–65, 467–69 (N.Y.Fam.Ct. 1977), *rev'd*, 68 A.D.2d 719, 418 N.Y.S.2d 597, 605 (N.Y.App.Div.1979).

5. Further, the ICA noted that the general rule does not apply "when the facts hypothesized in the exceptive provision are peculiarly within the knowledge of the defendant, or the evidence concerning them is within the defendant's private control." *Nobriga*, 10 Haw.App. at 358, 873 P.2d at 113 (internal quotation marks, brackets, and citation omitted).

6. ROH § 7–2.3 provides, in pertinent part, that "[i]t is unlawful to be the owner of an animal, farm animal or poultry engaged in animal nuisance as defined in Section 7–2.2." ROH § 7–2.2 (1990) defines "Animal nuisance," partly, as follows:

"Animal nuisance," for the purposes of this section, shall include but not be limited to any animal, farm animal or poultry which:
(a) Makes noise continuously and/or incessantly for a period of 10 minutes or intermittently for one-half hour or more to the disturbance of any person at any time of day or night and regardless of whether the animal, farm animal or poultry is physically situated in or upon private property[.]

**6**

moved for judgment of acquittal on the premise that the State had failed to prove defendant's conduct did not fall within the exceptions to the animal nuisance law set forth in ROH § 7–2.4(a).[7] *Id.* at 356, 873 P.2d at 112. The district court denied the motion. *Id.* at 357, 873 P.2d at 112. The ICA affirmed the denial, stating that the general prohibition against animal nuisance as set forth in ROH §§ 7–2.2 and 7–2.3 govern the elements of the case and "does not incorporate ROH § 7–2.4" as "the exceptions are located in a separate and distinct section of the ordinance." *Id.* at 359, 873 P.2d at 113.

The ICA also indicated "the burden of proving exceptions to a criminal statute appear to be codified in the Hawai'i Penal Code" pursuant to HRS §§ 701–114(1)(a) (1985) and 702–205 (1985). *Id.* at 358, 873 P.2d at 113. The ICA declared that HRS § 701–114(1)(a) requires that "the State's burden is to prove, beyond a reasonable doubt, each element of the offense," *id.*; "the elements of an offense" include that which "[n]egative[s] a defense," *id.*; "HRS § 701–115(1) (1985) defines a 'defense' as 'a fact or set of facts which negatives penal liability,' " *id.*; but " '[n]o defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented,' " *id.* at 358–59, 873 P.2d at 113 (quoting HRS § 701–115(2)(1985)).

■ In regard to the penal code requirements, the ICA reiterated that the prosecution "has the initial burden of negativing statutory exceptions to an offense only if the exceptions are incorporated into the definition of the offense." *Id.* at 359, 873 P.2d at 113. However, as the ICA explained, "[i]f a statutory exception to an offense constitutes a separate and distinct defense, ... the State's burden to disprove the defense beyond a reasonable doubt arises only after evidence of the defense is first raised by the defendant." *Id.*

### III.

■ Applying the foregoing formulation, the enacting clause for the offense of prostitution is HRS § 712–1200(1), because this clause "contains the general or preliminary description of the acts prohibited; i.e., proscribes the offensive deed." *State v. Lee*, 90 Hawai'i 130, 138 n. 7, 976 P.2d 444, 452 n. 7 (1999) (citations omitted) (defining the term "enacting clause"). HRS § 712–1200(5) does not prescribe the offense, but states an exception to the offense for law enforcement officers acting "in the course and scope of duties." Similar to *Nobriga*, then, the exception here, HRS § 712–1200(5), is not located in the same section, HRS § 712–1200(1), as the definition of the offense.[8]

As the exception in HRS § 712–1200(5) would negative the prostitution offense, it constitutes a defense. *See Nobriga*, 10 Haw. App. at 358, 873 P.2d at 113. In order to claim the benefit of this defense, then, evidence that Defendant fell within the exception must have been adduced. *See id.* However, Defendant did not adduce any such evidence at trial. Under *Nobriga*, the prosecution is not required to disprove the defense until there is evidence that the defendant falls within HRS § 712–1200(5). *Id.* Thus, the prosecution was not required to negate the defense. *See* HRS § 701–115(2) (1993) ("No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented."). There was, then, no defect in the proof of a prima facie case.

### IV.

■ As to issue (2), the prosecution must prove every element of a crime charged and the burden never shifts to the defendant. *Territory v. Adiarte*, 37 Haw. 463, 470–72 (1947). We recently stated that " '[t]he test on appeal in reviewing the legal sufficiency of the evidence is whether, when viewing the evidence in the light most favorable to the

7. ROH § 7–2.4(a) (1990) provides that "[n]othing in this article applies to animals, farm animals or poultry raised, bred or kept as a commercial enterprise or for food purposes where commercial kennels or the keeping of livestock is a permitted use."

8. Moreover, it may be noted that if Defendant was a law enforcement officer, this fact would be peculiarly within Defendant's knowledge or the evidence of such within Defendant's private control.

prosecution, substantial evidence exists to support the conclusion of the trier of fact.' " *State v. Agard,* 151 P.3d 802, 805 (Haw.2007) (quoting *State v. Bui,* 104 Hawai'i 462, 467, 92 P.3d 471, 476 (2004) (other citation omitted). "Substantial evidence" is defined as " 'credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to reach a conclusion.' " *Id.* (ellipses points, brackets, and citations omitted)).

As indicated previously, HRS § 712–1200(1) provides in relevant part that prostitution is committed "if the person ... agrees ... to engage in ... sexual conduct with another person for a fee." Under HRS § 712–1200(2), "sexual conduct" includes "sexual contact," as that term is "defined in section 707–700." In pertinent part, "sexual contact" meant any "touching of the sexual or other intimate parts of a person not married to the actor[.]" HRS § 707–700.

■ The evidence demonstrated that Defendant agreed to give Tallion a "handjob" for a fee of $20.00. Tallion confirmed with Defendant that the charge for the "out-call" was $100.00. When Tallion said, "So no blowjob, so handjob," Defendant responded, "Yah, I can do that." Tallion then asked whether "that cost extra," and according to Tallion, Defendant answered, "Add 20." Tallion testified he confirmed, "Oh, $20 for handjob," and Defendant replied, "Yes." This testimony indicates that the $20 added fee was [9] for the handjob.

Defendant argues that agreement for a handjob does not necessarily involve sexual conduct. She contends that Tallion never defined "assisted masturbation" and that although Tallion equated a "handjob" with sexual contact, he did admit that another licensed masseuse had given him a hand massage and, thus, the meaning of "handjob" is not always sexual in nature. The phrase "assisted masturbation" would appear susceptible to common understanding. "Masturbation" is defined, *inter alia,* as "the stimulation, other than by coitus, of anoth-

er's genitals resulting in orgasm." *Random House Dictionary of the English Language* 883 (Unabr. ed.1973). Genitals describe "the reproductive organs, especially the external sex organs." *The American Heritage Dictionary of the English Language* (4th ed.2000), *available at* http://www.bartleby.com/61/.

Tallion testified that " '[h]andjob' is street vernacular commonly used in prostitution for assisted masturbation." Defendant also testified that she knew that the term "handjob" could mean assisted masturbation.[10] As noted, the meaning of "sexual contact" in HRS § 712–1200(1) included "any touching of the sexual ... parts of a person[.]" HRS § 707–700. Plainly, the reference to "hand" in the term "handjob" connotes physical contact with genitals. Hence, considered in the strongest light for the prosecution, substantial evidence was adduced that would enable a person of reasonable caution to conclude, *see Agard,* 151 P.3d at 805, that Defendant agreed to engage in sexual contact with Tallion for a fee.

## V.

As to issue (3), HRS § 702–231 (1993) provides in relevant part:

> *Duress.* (1) *It is a defense to a penal charge that the defendant engaged in the conduct or caused the result alleged because he was coerced to do so by the use of, or a threat to use,* unlawful force against his person or the person of another, *which a person of reasonable firmness in his situation would have been unable to resist.*
>
> . . . .
>
> (5) *In prosecutions for any offense described in this Code, the defense asserted under this section shall constitute an affirmative defense. The defendant shall have the burden of going forward with the evidence* to prove the facts constituting such defense, unless such facts are supplied by the testimony of the prosecuting witness or circumstance in such testimony,

---

9. Tallion also testified he had never been married to Defendant and he had never "lived together as man and wife with [Defendant]." *See supra* note 2 defining sexual contact.

10. On cross-examination, the prosecution asked Defendant, "Did you know that 'handjob' could mean assisted masturbation?" and she replied in the affirmative.

*and of proving such facts by a preponderance of the evidence* pursuant to section 701–115.

(Emphases added.)

██ "The preponderance standard directs the factfinder to decide whether 'the existence of the contested fact is more probable than its nonexistence.' " *Kekona v. Abastillas,* 150 P.3d 823, 829 (Haw.2006) (quoting E. Cleary, McCormick on Evidence § 339, at 957 (3d ed.1984)) (other citation omitted). Accordingly, "[t]o prevail, [the defendant] need only offer evidence sufficient to tip the scale slightly in his or her favor, and [the prosecution] can succeed by merely keeping the scale evenly balanced." *Id.* (internal quotation marks and citations omitted).

██ Defendant contends her claims "meet the elements of the affirmative defense of duress by a preponderance of evidence." She argues that because the duress claim was "unchallenged by the [prosecution] or the [c]ourt[,] preponderance of the evidence is indeed established." However, the court considered Defendant's affirmative defense of duress and concluded that Defendant did not meet her burden.

██ Specifically, in its oral finding, the court stated, "[A]s far as the duress defense, the burden—it becomes an affirmative defense and the burden then shifts to the [D]efendant to prove that the duress did in fact occur by preponderance of the evidence, which the [c]ourt does not feel the [D]efendant has met that burden." In its written findings, the court found "Defendant failed to present an adequate defense to the charge." " 'A trial court's findings of fact are reviewed under the clearly erroneous standard.' " *State v. Keliiheleua,* 105 Hawai'i 174, 178, 95 P.3d 605, 609 (2004) (internal quotation marks and brackets omitted) (quoting *Dan v. State,* 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994)).

██ " 'A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake

has been made.' " *Foo v. State,* 106 Hawai'i 102, 112, 102 P.3d 346, 356 (2004) (quoting *State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995)). The record indicates that there was substantial evidence to support the finding and that it is not clear that a mistake has been made. *See id.*.

Defendant related that Tallion was "loud" and "demanding" and she only agreed to Tallion's request for a "handjob" because she felt threatened. However, upon cross-examination, Defendant conceded that (1) Tallion had not blocked her egress from the hotel room; (2) Tallion was not holding a weapon when he asked about the "blowjob"; (3) Tallion never told her that she could not leave the room; and (4) she never attempted to use the phone or walk out of the room.

██ Matters of credibility and the weight of the evidence and the inferences to be drawn are for the fact finder. *See Agard,* 151 P.3d at 805 (stating that " 'appellate courts will give due deference to the right of the trier of fact to determine credibility, weigh the evidence, and draw reasonable inferences from the evidence adduced' " (quoting *In re Doe,* 107 Hawai'i 12, 19, 108 P.3d 966, 973 (2005) (other citation omitted)) (internal quotation marks omitted)). Defendant did not testify to any "use of, or a threat of use, unlawful force against [her] person[.]" HRS § 702–231(1). Defendant acknowledged Tallion did not block her exit and she did not attempt to leave. Under these circumstances and giving due deference to the court as fact finder, it cannot be said the court's finding that Defendant failed to establish duress by a preponderance of the evidence was clearly erroneous. *See Foo,* 106 Hawai'i at 112, 102 P.3d at 356.

## VI.

██ As to Defendant's last issue, the dissent agrees with Defendant and argues that (1) "at the time of this court's holding in [*State v. Mueller,* 66 Haw. 616, 671 P.2d 1351 (1983)], there was no federal precedent addressing whether the criminalization of an utterly private sexual activity (and its associated monetary component) abridged an individual's right to privacy [but] *Lawrence* cre-

ated just such a precedent, confirming that individual decisions by married and unmarried persons 'concerning the intimacies of their physical relationship ... are a form of "liberty" protected by the Due Process Clause of the Fourteenth Amendment[,]' " dissenting opinion at 17, 155 P.3d at 1118, and (2) "article I, section 6 does not abide the criminalization of wholly private, consensual sexual activity between adults without the state's having demonstrated a compelling interest by way of 'injury to a person or abuse of an institution the law protects,' 539 U.S. at 568[, 123 S.Ct. 2472,]" dissenting opinion at 18, 155 P.3d at 1119. We must respectfully disagree with these propositions and discuss them herein.

## VII.

The dissent's first position is not tenable because it runs into the specific qualification in *Lawrence* that excludes prostitution as part of protected "liberty" under the federal due process clause.

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. *It does not involve public conduct or prostitution.* It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. *The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.* The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government.

539 U.S. at 578, 123 S.Ct. 2472 (emphases added).

Additionally, despite this clear exclusion, the dissent argues that a logical extension of *Lawrence* precludes the states from exercising their police power to curb prostitution.

> [W]here two consenting adults swap money for sex in a transaction undertaken entirely in seclusion, the analysis of the *Lawrence* majority, *despite the majority's attempt to avoid the notion, leads inexorably to the conclusion that the state may not exercise its police power to criminalize a private decision between two consenting adults to engage in sexual activity, whether for remuneration or not.*

Dissenting opinion at 18, 155 P.3d at 1119 (emphasis added). But, the dissent's position is not supportable on this premise. The Court has in the past drawn legal boundaries around its decisions, despite the fact that arguably logic would "lead[ ] inexorably" beyond such strictures. Thus, in *State v. Kam,* 69 Haw. 483, 748 P.2d 372 (1988), this court recognized that although the Court had held a state "would not be able to prohibit an individual from possessing and viewing ... pornographic materials in the privacy of his or her own home[,]" *id.* at 489, 748 P.2d at 376 (citing *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), "[t]he ... Court ha[d] effectively ruled that the protected right to possess obscene material in the privacy of one's home does not give rise to a correlative right to have someone sell or give it to others[,]" *id.* at 490, 748 P.2d at 376 (internal quotation marks and citation omitted), leading to the paradoxical conflict of a "citizenry['s] ... right to read and possess material which it may not legally obtain[,]") *id.* at 491, 748 P.2d at 377. Hence, although the Court's language may seemingly point to broader application, that does not portend an extension of a given proposition especially when, as here, the Court expressly limits the scope of the liberty interest protected.[11]

Furthermore, the dissent misreads *Lawrence.* As mentioned above, prostitution, *i.e.,* "swap[ping] money for sex," dissenting opinion at 18, 155 P.3d at 1119, is expressly rejected as a protected liberty interest under *Lawrence. Lawrence* did not involve an ex-

---

11. Contrary to the dissent's statement, *see* dissenting opinion at 18, 155 P.3d at 1119, the Court did not draw the distinction between private solicited prostitutions and public solicited prostitutions, assuming, *arguendo,* public solicitation is absent in this case.

change of money for sexual relations but focused on the *specific sexual conduct,* i.e., sodomy, as being outside the scope of legitimate government concern. It is important to remember that "[t]he question before the Court [was] the validity of a Texas statute making it a crime for two persons of the same sex to engage in certain intimate sexual conduct[,]" 539 U.S. at 562, 123 S.Ct. 2472, described as "(A) any contact between any part of the genitals of one person and the mouth or anus of another person; or (B) the penetration of the genitals or the anus of another person with an object[,]" *id.* (quoting Texas Penal Code Ann. § 21.01(1) (2003)). *Lawrence* thus contains a lengthy dissertation on homosexual conduct and sodomy dating back to 1533. *Id.* at 568–77, 123 S.Ct. 2472. As the Court stated, the case involved "two adults who ... engaged in sexual *practices* common to a homosexual lifestyle." *Id.* at 578, 123 S.Ct. 2472 (emphasis added).

Assuming, *arguendo,* that "*Lawrence* presupposed *private* sexual activity between two adults fully capable of giving valid consent[,]" dissenting opinion at 23, 155 P.3d at 1124, that does not mean *Lawrence* sanctioned prostitution in the "[n]arrow[er]," dissenting opinion at 23, 155 P.3d at 1124, form advocated by the dissent. *Lawrence* simply placed no qualification on excluding prostitution from its holding.

### VIII.

In *Lawrence,* the Court reconsidered its earlier holding in *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), where "Hardwick, in his own bedroom, [was observed] engaging in [sodomy] with another adult male." *Lawrence,* 539 U.S. at 566, 123 S.Ct. 2472. In doing so the majority adopted the dissent of Justice Stevens in *Bowers,* where a sodomy statute similar to that in Texas was upheld by the *Bowers* majority.[12] In his dissent, Justice Stevens rested on two contentions.

First, the fact that the governing majority in a State has traditionally *viewed a particular practice* as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by married persons, *concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of "liberty"* protected by the Due Process Clause of the Fourteenth Amendment. Moreover, *this protection extends to intimate choices by unmarried as well as married persons.*

*Bowers,* 478 U.S. at 216, 106 S.Ct. 2841 (Stevens, J., dissenting) (footnote and citations omitted) (emphases added). The majority in *Lawrence* decided that "Justice Stevens' analysis ... should have been controlling in *Bowers* and should control here." 539 U.S. at 578, 123 S.Ct. 2472.

Thus, *Lawrence* invalidated a criminal statute prohibiting the "particular *practice*" of sodomy because it involved the "intimacies of ... physical relationship" and such "intimate choices" should be left to unmarried as well as married persons. *Id.* at 577–78, 123 S.Ct. 2472 (emphasis added). *Lawrence,* then, was concerned with specific conduct seemingly aimed at persons engaged in homosexual relationships. Consequently, *Lawrence* precludes government interference or regulation of intimate sexual *practices* or *conduct* with respect to homosexual as well as heterosexual adults. Such intimate practices or conduct are not at issue in the instant case or *prohibited* by HRS § 712–1200, the prostitution statute. *Lawrence,* then, is not federal precedent for the proposition that "private sexual activity" "associated [with a] monetary component," "abridged" the "right to privacy" as the dissent argues. Dissenting opinion at 17, 155 P.3d at 1118.

---

12. The Georgia statute criminalizing sodomy at issue in *Bowers,* Georgia Code Ann. § 16-6-2 (1984), provides in pertinent part:

(a) A person commits the offense of sodomy when he performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another....

(b) A person convicted of the offense of sodomy shall be punished by imprisonment for not less than one nor more than 20 years[.]

478 U.S. at 187–88 n. 1, 106 S.Ct. 2841.

## IX.

As to the dissent's second position, in our view *Lawrence* as construed above does not vitiate the holding in *Mueller*. In *Mueller*, the defendant was charged with "engag[ing] in, or agree[ing] to engage in, sexual conduct with another person, in return for a fee, in violation of [HRS § ] 712–1200[,]" 66 Haw. at 618, 671 P.2d at 1354, as Defendant was so charged in the instant case. Somewhat similarly the question posed there was "whether the proscriptions of [HRS] § 712–1200 may be applied to an act of sex for a fee that took place in a private apartment." *Id.* at 619–20, 671 P.2d at 1354. In affirming the conviction, this court said that "we are not convinced a decision to engage in sex for hire is a fundamental right in our scheme of ordered liberty, . . . [therefore] we affirm [the defendant's] conviction." *Id.* at 618, 671 P.2d at 1353–54.

Unlike in the instant case, in *Mueller* "the activity in question took place in [defendant's] apartment, the participants were willing adults, and *there were 'no signs of advertising[,]'* " 66 Haw. at 618–19, 671 P.2d at 1354 (emphasis added). Despite the dissent's assertion "that the charged transaction," dissent at 23, 155 P.3d at 1124, was "wholly private," *id.*, it is arguable in *this* case that "public solicitation" was implicated, inasmuch as contact with Defendant was made by way of a newspaper ad soliciting members of the public and the assignation took place in a hotel as opposed to "the privacy of her own home." *Mueller*, 66 Haw. at 618, 671 P.2d at 1354.

## X.

As to the right of privacy in article I, section 6 of the Hawai‘i Constitution, the *Mueller* majority noted that (1) "a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt[,]" *id.* at 627, 671 P.2d at 1358 (internal quotation marks and citations omitted), (2) "only personal rights that can be deemed fundamental or implicit in the concept of ordered liberty are included in this guarantee of personal privacy[,]" *id.* at 628, 671 P.2d at 1359 (internal quotation marks and citations omitted), and (3) "[t]he defen-

dant has directed us to nothing suggesting a decision to engage in sex for hire at home should be considered basic to ordered liberty[,]" *id.*

 *Mueller* is precedent. "Precedent is an adjudged case or decision of a court, considered as furnishing an example of authority for an identical or similar case afterwards arising or a similar question of law[ ] . . . and operates as a principle of self-restraint . . . with respect to the overruling of prior decisions." *State v. Garcia*, 96 Hawai‘i 200, 205, 29 P.3d 919, 924 (2001) (brackets, internal quotation marks, and citations omitted) (ellipses points in original). In this regard, "[t]he policy of courts to stand by precedent and not to disturb settled points is referred to as the doctrine of *stare decisis*[.]" *Id.* (brackets, internal quotation marks, and citation omitted).

While not having like "force . . . in the context of constitutional interpretation," *id.* at 206, 29 P.3d at 925, "[t]he benefit of stare decisis is that it furnishes a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; eliminates the need to relitigate every relevant proposition in every case; and maintains public faith in the judiciary as a source of impersonal and reasoned judgments[,]" *id.* at 205–06, 29 P.3d at 924–25 (brackets, internal quotation marks, citations, and ellipses points omitted).

 Consequently, "a court should not depart from the doctrine of stare decisis without some compelling justification." *Id.* at 206, 29 P.3d at 925 (internal quotation marks, citations and emphasis omitted). "[W]hen the court reexamines a prior holding, [then,] its judgment is customarily informed by a series of prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case." *Id.* (internal quotation marks, citation, and brackets omitted).

There is no denying that " '[w]hile the outer limits of this aspect of privacy have not been marked by the Court [or this court], it is clear that among the decisions that an

individual may make without unjustified government interference are personal decisions relating to marriage ..., procreation ..., contraception ..., family relationships ..., and child rearing and education[,]' " *Mueller,* 66 Haw. at 627, 671 P.2d at 1359 (quoting *Carey v. Population Servs. Int'l,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (other citations omitted) (some internal quotation marks omitted)), and now qualified intimate sexual conduct between or among consenting adults.

The right to privacy has been expanded by the Court in discrete situations. *See, e.g., Kyllo v. United States,* 533 U.S. 27, 34, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (concluding that the government's use of a thermal imaging device from a public street to detect relative amounts of heat within a private home, which would have been previously unknowable without physical intrusion, constitutes "a search" within the meaning of the Fourth Amendment, and is presumptively unreasonable without a warrant, in order to "assure[ ] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted"); *Roe v. Wade,* 410 U.S. 113, 154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (concluding that "the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation"); *Stanley,* 394 U.S. at 568, 89 S.Ct. 1243 (holding that "the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime" because although "the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his [or her] own home"); *Griswold v. Connecticut,* 381 U.S. 479, 485–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (holding that a law which forbade the use of contraceptives unconstitutionally interfered with the "notions of privacy surrounding the marriage relationship").

This court has also extended privacy rights under our own constitution. *See, e.g., State v. Cuntapay,* 104 Hawai'i 109, 110, 85 P.3d 634, 635 (2004) (holding that "under Article I,

section 7 of the Hawai'i Constitution, a guest of a homedweller is entitled to a right of privacy while in his or her host's home" (footnote omitted)); *State v. Detroy,* 102 Hawai'i 13, 20–22, 72 P.3d 485, 492–94 (2003) (holding that *Kyllo,* 533 U.S. 27, 121 S.Ct. 2038, was dispositive of the defendant's federal constitutional claim and, additionally, that the use of a thermal imager to measure heat emanating from the interior of the defendant's apartment violated article I, section 7 of the Hawai'i Constitution because "[i]t has long been recognized in Hawai'i that generally, a person 'has an actual, subjective, expectation of privacy in his or her home' " (quoting *State v. Lopez,* 78 Hawai'i 433, 442, 896 P.2d 889, 898 (1995))); *State v. Bonnell,* 75 Haw. 124, 146, 856 P.2d 1265, 1277 (1993) (holding that "the defendants had an objectively 'reasonable privacy expectation that [they] would not be videotaped by government agents' in the employee break room" (quoting *United States v. Taketa,* 923 F.2d 665, 677 (9th Cir.1991))); *Kam,* 69 Haw. at 496, 748 P.2d at 380 (declaring a statute that prohibited the promotion of pornographic adult magazines unconstitutional under article I, section 6 of the Hawai'i Constitution "as applied to the sale of pornographic materials to a person intending to use those items in the privacy of his or her home").

Thus conduct once denominated criminal has later been afforded constitutional protection under the privacy umbrella. *See, e.g., Kyllo,* 533 U.S. at 34, 40, 121 S.Ct. 2038; *Roe,* 410 U.S. at 154, 93 S.Ct. 705; *Stanley,* 394 U.S. at 568, 89 S.Ct. 1243; *Griswold,* 381 U.S. at 485–86, 85 S.Ct. 1678; *Cuntapay,* 104 Hawai'i at 110, 85 P.3d at 635; *Detroy,* 102 Hawai'i at 20–22, 72 P.3d at 492–94; *Bonnell,* 75 Haw. at 146, 856 P.2d at 1277; *Kam,* 69 Haw. at 496, 748 P.2d at 380. And while such expansion may not be without controversy, prostitution seems almost singularly unique in historical and social condemnation.

## XI.

*Mueller* acknowledged the resiliency of prostitution laws as noted by the drafters of

the penal code.[13] This court declared that "[t]he drafters of the Hawai'i Penal Code justified the enactment of HRS § 712–1200 on 'the need for public order.' [Thus this court] would not dispute that it was reasonable for the legislature to act on that basis." 66 Haw. at 628–29, 671 P.2d at 1359–60 (footnote omitted). It was recognized that "[a] large segment of society undoubtedly regards prostitution as immoral and degrading, and the self-destructive or debilitating nature of the practice, at least for the prostitute, is often given as a reason for outlawing it. [Accordingly, w]e could not deem these views irrational."[14] *Id.* at 629, 671 P.2d at 1360.

13. *Mueller* referred to

[t]he commentary on HRS § 712–1200 ... in pertinent part:

Our study of public attitude in this area revealed the widespread belief among those interviewed that prostitution should be suppressed entirely or that it should be so restricted as not to offend those members of society who do not wish to consort with prostitutes or to be affronted by them. Making prostitution a criminal offense is one method of controlling the scope of prostitution and thereby protecting those segments of society which are offended by its open existence. This "abolitionist" approach is not without its vociferous detractors. There are those who contend that the only honest and workable approach to the problem is to legalize prostitution and confine it to certain localities within a given community. While such a proposal may exhibit foresight and practicality, *the fact remains that a large segment of society is not presently willing to accept such a liberal approach. Recognizing this fact and the need for public order, the Code makes prostitution and its associate enterprises criminal offenses.*

66 Haw. at 629 n. 8, 671 P.2d at 1360 n. 8 (emphasis added).

14. Relatedly, there is a general consensus in the international community that prostitution has negative consequences. The Convention for the Suppression of the Traffic in Person and the Exploitation of the Prostitution of Others states that "prostitution and the accompanying evil of the traffic in person for the purpose of prostitution are incompatible with the dignity and worth of the human person and endanger the welfare of the individual, the family and the community." Dec. 2, 1949, 96 U.N.T.S. 271 [hereinafter the Convention]. The parties to the Convention agree to punish any person who "[e]xploits the prostitution of another person, even with the consent of that person" and "to take or to encourage, through their public and private education, health, social, economic and other related

XII.

It may be that non-injurious sexual conduct by consenting adults in a private place for a fee preceded by (veiled) public advertising may one day be drawn into the protective shelter of Hawaii's privacy provision, as has other conduct once thought of as illegal. But "[t]he sum of experience," *id.*, as elucidated in the penal code presently, seems to the contrary. *See supra* note 13; *cf. Janra Enters., Inc. v. City & County of Honolulu,* 107 Hawai'i 314, 322, 113 P.3d 190, 198 (2005) (holding that "viewing adult material in an enclosed panoram booth on commercial premises is not protected by the fundamental

services, measures for the prevention of prostitution and for the rehabilitation and social adjustment of the victims of prostitution and of the offences referred to in the present Convention." *Id.*

The United States has agreed to "take all appropriate measures, including legislation, to suppress all forms of traffic in women and exploitation of prostitution of women." Convention on the Elimination of All Forms of Discrimination against Women, Dec. 18, 1979, 1249 U.N.T.S. 13, 19 I.L.M. 33 (1980) [hereinafter the Convention on Discrimination]. The Convention on Discrimination was adopted in 1979 by the UN General Assembly and as of Nov. 2006, 185 countries (over 90% of the members of the UN) are parties to the Convention. Several of the countries that have ratified the treaty are Afghanistan, Australia, Austria, Cuba, China, Germany, Israel, Italy, Mexico, and Netherlands. *See* United Nations, Division on the Advancement of Women, http://www.un.org/womenwatch/daw/cedaw/states.htm (last visited Feb. 21, 2007).

This court has cited international authority in resolving appeals. *See Almeida v. Correa,* 51 Haw. 594, 602 n. 9, 603, 465 P.2d 564, 570 n. 9, 571 (1970) (holding "that the exhibition of a child to the finder of fact in a paternity case is not to be permitted," but that "expert testimony concerning the resemblance of an child to the person alleged to be the father is admissible to prove or disprove the paternity of the child" and relying on a United Nations Educational, Scientific and Cultural Organization (UNESCO) document for the proposition that " 'individuals belonging to different major groups of mankind are distinguishable by virtue of their physical characters, but individual members, or small groups, belonging to different races within the same major group are usually not so distinguishable' " (quoting Statement on the Nature of Race and Race Difference by Physical Anthropologists and Geneticists, Sept. 1952 (UNESCO) quoted in A. Montagu, *Man's Most Dangerous Myth: the Fallacy of Race* 368 (4th ed.1964))).

right of privacy enshrined in article I, section 6 of the Hawai'i Constitution"). Hence, "prudential and pragmatic considerations" do not compel a departure from the doctrine of stare decisis, *Garcia,* 96 Hawai'i at 206, 29 P.3d at 925, so as to justify overruling *Mueller,* much less based on the Court's present express holding in *Lawrence.*

■ Of course the legislature may alter the law to allow non-injurious sexual contact by consenting adults in a private place for a fee, conduct that is presently proscribed by HRS § 712–1200(1). For,

[a]s a general rule, the role of the court in supervising the activity of the legislature is confined to seeing that the actions of the legislature do not violate any constitutional provision. We will not interfere with the conduct of legislative affairs in absence of a constitutional mandate to do so, or unless the procedure or result constitutes a deprivation of constitutionally guaranteed rights.

*Schwab v. Ariyoshi,* 58 Haw. 25, 37, 564 P.2d 135, 143 (1977) (citations omitted). We only decide that the considerations before us do not compel the legal conclusion that, on *constitutional* grounds, HRS § 712–1200 must be ruled invalid.

1. HRS § 712–1200, entitled "Prostitution," provides in relevant part:

(1) A person commits the offense of prostitution if the person engages in, or agrees or offers to engage in, sexual conduct with another person for a fee.
(2) As used in [paragraph] (1), "sexual conduct" means "sexual penetration," "deviate sexual intercourse," or "sexual contact," as those terms are defined in [HRS §] 707–700.
....
(5) This section shall not apply to any member of a police department, a sheriff, or a law enforcement officer acting in the course and scope of duties.
HRS § 707–700 (Supp.2001) provided in relevant part:
"Married" includes persons legally married, and a male and female living together as husband and wife regardless of their legal status, but does not include spouses living apart.
....
"Sexual contact" means any touching of the sexual or other intimate parts of a person not

## XIII.

Based on the foregoing, the court's August 26, 2003 judgment is affirmed.

Dissenting Opinion by LEVINSON, J.

I respectfully disagree with the majority's treatment of the defendant-appellant Pame Ann Mary Leilani Romano's argument that Hawai'i Revised Statutes (HRS) § 712–1200(1) (Supp.1998),[1] as applied to her in the present matter, violates both the federal right to privacy articulated by the United States Supreme Court in *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), and the state constitutional protection provided by Article I, section 6 of the Hawai'i Constitution [hereinafter, "article I, section 6"].[2] Accordingly, I would reverse the district court's August 26, 2003 judgment.

## I. BACKGROUND

Inasmuch as the disposition of the present matter relies significantly on its unique facts, I summarize them here.

The present matter arose out of an undercover operation conducted by the Morals Detail of the Honolulu Police Department (HPD) at the former Aston Waikiki Beach Hotel (the Aston). On August 13 and 26, 2003, the district court conducted a bench

married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.
Effective May 10, 2004, the definition of sexual contact was amended in relevant part to read "... any touching, other than acts of "sexual penetration," of the sexual or other intimate parts of a person not married to the actor ..." (new language underscored). *See* 2004 Haw. Sess. L. Act 61, §§ 3 and 8 at 303–04. Effective May 22, 2006, the definition was further amended in respects immaterial to the present matter. *See* 2006 Haw. Sess. L. Act 116, §§ 4 and 10 at 331–33.

2. Article I, section 6 of the Hawai'i Constitution provides: "The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right." This provision was drafted by the 1978 constitutional convention and added following voter approval in the general election of November 7, 1978.

trial, at which the following relevant testimony was adduced.

### A. The Prosecution's Case

On January 18, 2003, HPD Officer Jeffrey Tallion checked into a room in the Aston to investigate prostitution activity. His assignment that evening was to "set up appointments" with suspected prostitutes advertising in the telephone book, in the *PennySaver*, in *MidWeek*,[3] or on the internet.

Officer Tallion answered "a small little ad in the [*PennySaver*] Classified[s] that advertised massage service." The advertisement to which Officer Tallion responded read:

$30 1/2 HOUR
**RELAXING/ACUPRESSURE
MASSAGE
BY PAM (PAME)**
**[telephone number]**
SAME DAY
APPOINTMENT
[two Honolulu addresses]
(Lic: [# # # # # #])

(Emphases in original.)[4] Officer Tallion "called the number for the massage" and spoke to a woman identifying herself as "Pame." Officer Tallion arranged for an "outcall[ ]" for $100.00 per hour. Officer Tallion conceded on cross-examination that, during the telephone conversation arranging the appointment, there was no "conversation about any kind of illicit conduct such as sexual acts."

Officer Tallion met Romano outside the Aston and confirmed that she was the woman he had spoken to earlier on the telephone. Romano was wearing neither "low-cut" nor "see-through" clothing but, rather, "regular clothes ... nothing revealing." As Officer Tallion summarized, "[Romano] was not walking up and down the streets in any kind of revealing ... attire." The two proceeded up to Officer Tallion's hotel room. The rec-

ord indicates no discussion concerning massage or any topic of a suggestive nature until Romano and Officer Tallion were in the hotel room. Once inside the hotel room, Officer Tallion testified, he

> [c]onfirmed that it was a hundred dollars for the out-call which was related ... when I first made the appointment; and then ... I asked if she did anything else. And she said, "Like what? Dance?" And I said, "No." And then she goes, "Well, what did you have in mind?"
>
> At that time, I said, "Well, I was referring to a blowjob[."] And she goes, "No, hands only." I go, "So no blowjob, so handjob." She goes, "Yeah, I can do that." So at that time I go, "Well, does that cost extra?" She goes, "Add 20[."] So I go, "Oh, $20 for a handjob." And she replied, "Yes[."]

After the aforementioned dialogue, Officer Tallion gave a prearranged signal and other officers entered the room and arrested Romano. Officer Tallion estimated that their conversation inside the hotel room spanned ten minutes.

On cross-examination, Officer Tallion conceded that Romano never physically attempted to touch him sexually, nor did she exhibit a prophylactic, disrobe, or direct him to remove his clothing.

Officer Tallion further testified that, based on his knowledge and training as a police officer, Romano had offered him sexual conduct during their conversation: " 'Handjob' is the street vernacular commonly used in prostitution for assisted masturbation." He indicated that Romano did not have time to "make any motions towards [him] to suggest that she was going to commit any sexual act" because, after he "obtained the violation," he signaled the arrest team. In other words, he "didn't go for an overt act" because he "didn't have to go that far."

---

**3.** I would take judicial notice that the *PennySaver* is a free "buy and sell" publication distributed in Hawai'i and that *MidWeek* is similarly a free or inexpensive newspaper with heavy advertising content and wide distribution throughout O'ahu.

**4.** Testifying in her own defense, Romano confirmed that she was a self-employed massage therapist and had held an active license for nineteen years. She advertised under the "Body, Mind and Spirit," "Massage" or "Health and Fitness" sections of *PennySaver*, but never under its "Adult" or "Personal" sections.

## B. *Romano's Motion To Dismiss*

In her motion to dismiss, Romano argued that *Lawrence v. Texas* effectively invalidated HRS § 712–1200(1), *see supra* note 1, as applied to Romano's private sexual activity with a putatively consenting adult. In the written motion itself, Romano cited only article I, section 7 of the Hawai'i Constitution and the fourth amendment to the United States Constitution (concerning searches and seizures) as authority, but her entire memorandum in support discussed *Lawrence,* which concerned the due process clause of the fourteenth amendment to the United States Constitution and, by implication, the other privacy-related amendments and their penumbras, *see infra* part II.B.1. In the August 26, 2003 hearing on the motion, Romano elaborated orally that the interpretation of Hawaii's constitutional right to privacy in *State v. Mueller,* 66 Haw. 616, 671 P.2d 1351 (1983), "w[ould] have to change" "in light of *Lawrence.*" (Boldface omitted.) The sum total of Romano's argument was a challenge to HRS § 712–1200(1), not on its face but, rather, *as applied* to Romano's particular conduct. She impliedly analogized the present matter to *Mueller* and urged that a materially similar case should be resolved differently post-*Lawrence,* inasmuch as "this is not a situation of public conduct[;] . . . [t]his is a private activity":

> [I]n . . . *Mueller,* the defendant [Mueller] . . . entertained individuals at her home. Police officer[s] under cover approached her . . . in the privacy of her home. . . .
>
> . . . .
>
> . . . [I]f for argument's sake . . . the act was committed, . . .
>
> . . . she was not out on the street. There was not commercial activity in front of individuals. This was a private conversation taking place in a room according to . . . [O]fficer [Tallion].

(Boldface omitted.)

The prosecution asserted that the applicability of *Lawrence,* by its own language, was limited to "consenting adults where there is no fee included," not prostitution. Moreover,

the prosecution offered up as state interests in criminalizing sexual conduct between consenting adults for a fee the potential for "disruption to the marital contract" and "sexual diseases that might get passed through promiscuous sex." Romano maintained that, in *Lawrence,* "the . . . State made the same arguments . . . about . . . sexually transmitted diseases . . .; also, morality issues and the like," but that the *Lawrence* "Court said that doesn't apply between consensual adults in the privacy of their own home."

The district court denied Romano's motion, stating that "the court does not agree with the applicability of *Lawrence* . . . to the instant situation. What [Romano] is asking is for this court to prematurely second-guess the Hawai['ji Supreme Court as to how [it] would apply *Lawrence* to our particular statute here in . . . Hawai['ji." (Boldface omitted.)

## II. *IN LIGHT OF LAWRENCE AND ARTICLE I, SECTION 6, ROMANO'S CONVICTION WAS UNCONSTITUTIONAL.*

### A. *Lawrence Severely Undermined The Rationale Of State v. Mueller By Announcing A Federal Privacy Interest In Private Consensual Sex.*

At first blush, this court's decision in *Mueller* would appear to foreclose Romano's position that HRS § 712–1200(1), *see supra* note 1, impermissibly abridged her constitutional right to privacy.[5] Similarly, in *Mueller,* the alleged barter of sex for money "took place in . . . Mueller's apartment, the participants were willing adults, and there were 'no signs of advertising' anywhere in the apartment building." 66 Haw. at 618–19, 671 P.2d at 1354. Mueller argued "that the activity's private setting and the absence of public solicitation set her case apart 'from every other prostitution case.' And she maintained a decision to engage in sex with 'a voluntary adult companion' was 'well within her constitutional right to privacy.'" 66 Haw. at 619, 671 P.2d at 1354. The district court rejected her argument, finding that the state had a

---

5. It is unclear whether the defendant in *Mueller* based her arguments on both the federal and

state constitutions, but this court based its decision on an analysis of both.

" 'compelling interest in controlling prostitution in private residences as well as the streets.' " *Id.* This court affirmed on the basis that "we are not convinced a decision to engage in sex for hire is a fundamental right in our scheme of ordered liberty." 66 Haw. at 618, 671 P.2d at 1353. The *Mueller* court phrased "[t]he sole issue posed on appeal" as "whether the proscriptions of ... [ ]HRS[ ] § 712–1200 may be applied to an act of sex for a fee that took place in a private apartment." 66 Haw. at 619–20, 671 P.2d at 1354 (footnote omitted).

The *Mueller* court surveyed federal precedent construing an individual's right to privacy as derived from the federal bill of rights in the context of marriage, contraception, abortion, and pornography. *Mueller*, 66 Haw. at 620–22, 671 P.2d at 1354–55 (quoting *Roe v. Wade*, 410 U.S. 113, 152–54, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Stanley v. Georgia*, 394 U.S. 557, 565, 568–69, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Griswold v. Connecticut*, 381 U.S. 479, 484–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)). Ultimately, however, the exercise was unhelpful inasmuch as the *Mueller* court determined that "there has been no clear and binding judicial statement on the matter of our present concern." *Mueller*, 66 Haw. at 622, 671 P.2d at 1355. The *Mueller* court noted that, at least by 1983, "[w]hat little we ha[d] heard from the [United States Supreme] Court ... ha[d] been in the muted tones of a summary affirmance of the decision of a three-judge [panel] upholding the constitutionality of a state statute making sodomy a crime and by way of dicta in other decisions." 66 Haw. at 622, 671 P.2d at 1355–56 (citing *Doe v. Commonwealth's Attorney for City of Richmond*, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), *aff'g* 403 F.Supp. 1199 (E.D.Va.1975)). In short, at the time of this court's holding in *Mueller*, there was no federal precedent addressing whether the criminalization of an utterly private sexual activity (and its associated monetary component) abridged an individual's right to privacy.

*Lawrence* created just such a precedent, confirming that individual decisions by married and unmarried persons "concerning the intimacies of their physical relationship ... are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." [6] 539 U.S. at 578, 123 S.Ct. 2472. The Court thereby overruled *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), and, by implication, *Commonwealth's Attorney*.

In *Lawrence*, the charged conduct, denominated in the challenged Texas statute as " 'deviate sexual intercourse with another individual of the same sex,' " was undertaken "in private and consensual[ly]." 539 U.S. at 562, 564, 123 S.Ct. 2472 (quoting Tex. Penal Code Ann. § 21.06(a) (2003)). The analysis of the majority opinion, authored by Justice Kennedy, centered on the private nature of the conduct in question and the protections afforded individuals "from unwarranted government intrusions into a dwelling or other private places," as well as "liberty of the person ... in its more transcendent dimensions." *See id.* at 562, 564, 123 S.Ct. 2472 (framing the question as "whether the petitioners were free as adults to engage in the private conduct in the exercise of their liberty"), 567, 123 S.Ct. 2472 (noting that "adults may choose to enter upon [a homosexual] relationship in the confines of their homes and their own private lives and still retain their dignity as free persons").

Having overruled *Bowers*, the majority expressly limited the extent of its holding: "*The present case* does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not be easily refused. It *does not involve public conduct or prostitution.*" *Id.* at 578, 123 S.Ct. 2472 (emphases added). No further explanation of prostitution's exclusion was forthcoming, but the thrust of the *Lawrence* majority's analysis supports the conclusion that the Court was focused on addressing only private sexual activity among adults ca-

---

**6.** *See* U.S. Const. amend. XIV, § 1 ("No State shall ... deprive any person of life, liberty, or property, without due process of law....").

pable of consenting and, therefore, *to the extent that prostitution involves public solicitation,* it departed from the realm of the private and, hence, from the scope of the *Lawrence* analysis. However, where two consenting adults swap money for sex in a transaction undertaken entirely in seclusion, the analysis of the *Lawrence* majority, despite the majority's attempt to avoid the notion, leads inexorably to the conclusion that the state may not exercise its police power to criminalize a private decision between two consenting adults to engage in sexual activity, whether for remuneration or not. *See* 539 U.S. at 590, 123 S.Ct. 2472 (Scalia, J., dissenting) (arguing that the majority's recognition of " 'an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives *in matters pertaining to sex*' (emphasis added)," 539 U.S. at 572, 123 S.Ct. 2472, renders prostitution laws based on morality unenforceable). Indeed, the *Lawrence* majority addressed the issue of consensual homosexual sex in the same terms many would use to describe prostitution:

> The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives. These considerations do not answer the question before us, however. The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. "Our obligation is to define the liberty of all, not to mandate our own moral code." *Planned Parenthood ... v. Casey,* 505 U.S. 833, 850[, 112 S.Ct. 2791, 120 L.Ed.2d 674] (1992).

539 U.S. at 571, 123 S.Ct. 2472. In short, the analysis in *Lawrence* severely undermines this court's federal constitutional analysis in *Mueller,* and article I, section 6, *see supra* note 2, casts further doubt on *Mueller's* viability. Indeed, article I, section 6 does not abide the criminalization of wholly private, consensual sexual activity between adults

without the state's having demonstrated a compelling interest by way of "injury to a person or abuse of an institution the law protects," *id.,* 539 U.S. at 568, 123 S.Ct. 2472.

B. *The Jurisprudence Of This Court And The Intent Of The Drafters Of Article I, Section 6, Require That The State's Criminalization Of A Private Transaction Be Justified By A Compelling Interest In Preventing Harm To Others.*

1. *The fundamental right "to be left alone"*

The *Mueller* court next turned to the privacy provision adopted in 1978 as article I, section 6 of the state constitution. First, the court acknowledged that the "terse language" of article I, section 6 required it to resort to extrinsic aids to construction. The *Mueller* court noted that the delegates to the constitutional convention had recorded "the[ir] intent ... to [e]nsure that privacy is treated as a fundamental right," Comm. Whole Rep. No. 15, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978 [hereinafter, "Proceedings"] at 1024 (1980), but the court also implied that Hawaii's newly codified privacy right was circumscribed by federal precedent. *See* 66 Haw. at 625–26, 671 P.2d at 1357–58. That is, the constitutional convention having mused that the watershed right to privacy "is *similar* to the privacy right discussed in cases such as *Griswold ..., ... Baird, Roe,* etc." (emphasis added), this court apparently viewed that language as conclusive proof that article I, section 6 embodied no broader privacy right than what already existed on the federal level. The *Mueller* court summarily abandoned all hope of discerning meaning beyond the federal bill of rights and its penumbra, finding itself "led back to *Griswold,* [*Baird* ], and *Roe* and ... to have come full circle in our search for guidance on the intended scope of the privacy protected by the Hawai['i] Constitution." 66 Haw. at 626, 671 P.2d at 1358.

The *Mueller* court's narrow construction of article I, section 6 has since been called into question:

"As the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader privacy protection than that given by the federal constitution." [*State v.*] *Kam,* 69 Haw. [483,] 491, 748 P.2d [372,] 377 [ (1988) ]. Moreover, unlike the federal constitution, our state constitution contains a *specific* provision *expressly* establishing the right to privacy as a constitutional right. Thus, ... the text of our constitution appear[s] to invite this court to look beyond the federal standards in interpreting the right to privacy. *State v. Mallan,* 86 Hawai'i 440, 448, 950 P.2d 178, 186 (1998) (emphases in original); *see also Kam,* 69 Haw. at 491, 748 P.2d at 377.

The roots of article I, section 6 extend deep into this court's jurisprudence. *State v. Lee,* 51 Haw. 516, 465 P.2d 573 (1970), considered an individual's liberty from unwarranted exercise of the state's police power:

[W]here an individual's conduct, or a class of individuals' conduct, does not directly harm others the public interest is not affected and [such conduct] is not properly *the subject of the police power of the* legislature. However, where the legislature has determined that the conduct of a particular class of people recklessly affects their physical well-being and that the consequent physical injury and death is so widespread as to be of grave concern to the public and where the incidence and severity of the physical harm has been statistically demonstrated to the satisfaction of th[is c]ourt, then the conduct of that class of people affects the public interest and is properly within the scope of the police power. Of course, where the conduct sought to be regulated is in furtherance of a specific constitutional right, a different situation arises.

51 Haw. at 521, 465 P.2d at 577. As it applied this rule to the facts of *Lee,* however, this court observed "that the continued viability of our society requires that [motorcycle users] protect themselves from physical injury or death," that "[t]he burden imposed [ (*i.e.,* wearing a helmet while operating a motorcycle) ] is directly and immediately re-lated to the evil sought to be controlled," and that "a narrower means to protect motorcyclists could hardly be conceived." 51 Haw. at 522, 465 P.2d at 576–77. Justice Abe disagreed, implying that the helmet law "attempts to infringe upon and stifle fundamental personal liberties for one's own safety and is not concerned with the preservation of public order, safety, health and morals, or for the public welfare. Then, the fact that the general public considers it foolhardy to ride a motorcycle without a safety helmet ... should not be used as a criterion for defining the non-use of a helmet a criminal offense." *See* 51 Haw. at 528, 465 P.2d at 580 (Abe, J., dissenting).

Justice Abe's concurring opinion in *State v. Kantner,* 53 Haw. 327, 334–39, 493 P.2d 306, 311–13 (1972) (Abe, J., concurring), in which the appellants appealed a conviction for marijuana possession, trumpeted the vitality of the principle that "one has a fundamental right of liberty to make a fool of [one]self as long as [one's] act does not endanger others, and that the state may regulate the conduct of a person under pain of criminal punishment only when [the person's] actions affect the general welfare—that is, where others are harmed or likely to be harmed." 53 Haw. at 336–37, 493 P.2d at 312 (Abe, J., concurring) (citing *Lee,* 51 Haw. at 524–28, 465 P.2d at 578–80 (Abe, J., dissenting)). The plurality in *Kantner* did not contravert Abe's assertion directly but, rather, began its analysis by noting that the appellants had conceded "that the State may properly regulate the possession of marihuana under the police power." 53 Haw. at 328, 493 P.2d at 307. In the view of the *Kantner* plurality, the appellants essentially argued "that the State has so unreasonably and irrationally exercised its police power that the present statutory scheme for the prohibition of possession of marihuana violates the constitutional guarantees of equal protection and due process of law" by classifying marijuana as a narcotic despite uncontroverted evidence it did not scientifically meet the definition of drugs in that class. 53 Haw. at 328–29, 493 P.2d at 307–08.

The *Kantner* plurality disposed of the appellants' argument by employing a standard

equal protection/due process analysis, concluding that use of the term "narcotic" was not "so misleading as to confuse legislators in their law-making activities or to confuse persons of common understanding in their effort to determine whether possession of marihuana constitutes a crime" and that the disparate treatment of alcohol and marijuana was justified on the basis that little was known of marijuana's long-term health effects. 53 Haw. at 329–31, 493 P.2d at 308–09.

To the degree that the *Kantner* plurality did address the appellants' contention that the personal use of marijuana implicated a fundamental liberty interest leading to a heightened standard of review, it merely stated that "[w]e doubt ... that the use of a mind[-]altering drug, *absent an intimate connection with a 'preferred freedom*[,'] requires the standard of review which [the] appellants suggest" (emphasis added), concluding ultimately that "there is no fundamental guarantee protecting the use and possession of euphoric drugs," basing its conclusion wholly on the definition of a preferred freedom extant at the time under the federal constitution as an activity that is "essential, not merely desirable, for the exercise of the specifically enumerated rights." *Id.* (emphasis added) (summarizing *Griswold*). The plurality, therefore, did not dispute Justice Abe's assertions that individual liberty foreclosed the intrusion of the state's police power into wholly private activity that did not harm others and that any infringement of that preferred freedom mandated heightened scrutiny. Rather, the *Kantner* plurality concluded that, under federal precedent at the time, the possession of marijuana was not a fundamental right and, *hence, no "preferred freedom" was infringed.* 53 Haw. at 333, 493 P.2d at 310 (emphasis added).

The *Lee* tenet of individual liberty was reaffirmed a year later in *State v. Cotton*, 55 Haw. 138, 139, 516 P.2d 709, 710 (1973) ("We accept now ... the fundamental tenet that the relationship between the individual and the state leaves no room for regulations

which have as their purpose and effect solely the protection of the individual from his own folly."). It was neglected, but not repudiated, over the following years by *State v. Baker*, 56 Haw. 271, 535 P.2d 1394 (1975), *State v. Renfro*, 56 Haw. 501, 542 P.2d 366 (1975), and *State v. Bachman*, 61 Haw. 71, 595 P.2d 287 (1979). In *Baker*, the defendants were charged with possession of marijuana, but the district court, evidently tracking the analysis of *Lee, Cotton,* and the concurring and dissenting trio in *Kantner*—Justices Abe, Bernard H. Levinson, and Kobayashi—*see Mallan*, 86 Hawai'i at 475 n. 26, 950 P.2d at 213 n. 26 (Levinson, J., dissenting), "placed on the State the burden of showing clearly and convincingly that the possession of marijuana ... constitutes a harm either to the individual or the community." *Baker,* 56 Haw. at 276, 535 P.2d at 1397. This court reversed the ruling of the district court, asserting that beginning, as the district court did, by considering the "fundamental right of liberty of a human being to conduct himself in a manner which neither harms himself nor others" is "to begin with the wrong end of the stick." 56 Haw. at 278–79, 535 P.2d at 1398. The *Baker* majority deferred to the legislature to determine the proper extent of the regulation of intoxicating substances, being careful, however, to distinguish its holding from the outcome in *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), in which the confronted Georgia statute " 'infringe[d] ... fundamental liberties protected by the First and Fourteenth Amendments.' " 56 Haw. at 279–80, 535 P.2d at 1399 (quoting *Stanley*, 394 U.S. at 567, 568 & n. 11, 89 S.Ct. 1243). The *Baker* court implicitly rejected the appellants' contention that the personal use of marijuana was a private act protected, as articulated in *Griswold*, 381 U.S. 479, 85 S.Ct. 1678, by the federal right to privacy. *Cf.* 56 Haw. at 285, 535 P.2d at 1402 (Kobayashi, J., dissenting).

The *Baker* majority further concluded that, "[w]hile our State Constitution has a right of privacy provision,[7] we do not find in

---

7. Haw. Const. art. I, § 5 (1968) (renumbered as Haw. Const. art. I, § 7 (1978)) provided:

The right of the people to be secure in their persons, houses, papers and effects against un-

reasonable searches, seizures, and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly de-

that provision any intent to elevate the right of privacy to the equivalent of a first amendment right," 56 Haw. at 280, 535 P.2d at 1399 (one footnote omitted and one added). However, crucial to the present matter, the *Baker* court distinguished an opinion championed by the appellees: in *Gray v. State*, 525 P.2d 524 (Alaska 1974), the Alaska Supreme Court held that, under a newly enacted state constitutional amendment that expressly articulated a right to privacy,[8] a statute that infringes on the right to privacy must demonstrate a compelling state interest to survive a constitutional challenge. *Id.* at 527. The *Baker* court conceded that, if a fundamental right to privacy were implicated in the possession of marijuana, "it would take away from our ... drug laws the presumption of constitutionality and require the showing of a compelling state interest before any of them could be enforced." 56 Haw. at 280, 535 P.2d at 1400. However, there being no equivalent privacy interest articulated in the Hawaiʻi Constitution *yet*, the court did not reach that question.

Finally, the *Baker* majority, while "not unmindful ... ʻ... that the concern for public health and safety is relevant only insofar as the actions of one individual may threaten the well-being of others,' " first sidestepped Justice Abe's rationale on the basis that the appellees had conceded that the state's police power could regulate marijuana possession and then woodenly distinguished *Lee* and *Cotton* as "inapplicable" because they dealt with motorcycle helmets and goggles and not marijuana. *See* 56 Haw. at 282, 535 P.2d at 1400-01 (quoting *United States v. Kiffer*, 477 F.2d 349, 354 (2d Cir.1973)). *Renfro* and *Bachman* subsequently relied on *Baker* to uphold the constitutionality of laws criminalizing marijuana possession in the face of similar challenges, *see Renfro*, 56 Haw. at 503, 542 P.2d at 368 (regurgitating the *Baker* court's reasoning "that neither the federal nor Hawaii constitutions has elevated the right of privacy to the equivalent of a first amendment right"); *Bachman*, 61 Haw. at 72, 595 P.2d at 287 ("What we said in ... *Baker* and ... *Renfro* is still determinative ....") (internal citations omitted).

*Baker, Renfro* and *Bachman*—and the federal grounds upon which *Mueller* in part relied—were rooted in the inability of this court, in considering the activity in question, to discern any infringement of a fundamental right similar to those emanating from and incorporated into the states through the first, third, fourth, fifth, ninth, and fourteenth amendments to the United States Constitution, *cf. Griswold*, 381 U.S. at 484, 85 S.Ct. 1678. Inasmuch as the activities in those cases did not implicate a fundamental right, this court reasoned, the respective statutes criminalizing those activities could stand on mere rational bases. *Lawrence* renders that reasoning inapposite in the present matter by discerning, within the scope of the federal right to privacy, a fundamental right to private sexual relations.

### 2. The genesis of article I, section 6

Concomitantly, this court has, in the past, recognized that the drafters of article I, section 6 intended that the right to be left alone be guarded by a compelling interest standard of scrutiny and, hence, a presumption against the constitutionality of criminalizing private behavior.

*Kam*, which quoted with approval the constitutional convention's Committee on Bill of Rights, Suffrage and Elections, summarized the "harm to others" concept as the boundary between the state's police power and the fundamental right to privacy:

> Perhaps the most important aspect of privacy is that it confers upon people the most important right of all—the right to be left alone. As Justice Brandeis said in his now celebrated and vindicated dissent in *Olmstead v. U[nited ] S[tates ]*, 277 U.S. 438[, 479, 48 S.Ct. 564, 72 L.Ed. 944] (1928)[ (Brandeis, J., dissenting) ]:

scribing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.
The privacy provision now enshrined in article I, section 6 had not yet been adopted.

8. Alaska Const. art. I, § 22, effective October 14, 1972, provides: "The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section."

"The makers of our Constitution ... conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the most valued by civilized [people]."

*It gives each and every individual the right to control certain highly personal and intimate affairs of his own life. The right to personal autonomy, to dictate his own lifestyle, to be oneself are included in this concept of privacy.* As Justice Abe stated in his concurring opinion in *State v. Kantner*, 53 Haw. 327, [336,] 493 P.2d 306[, 312] (1972)[ (Abe, J. concurring) ]: each person has the "fundamental right of liberty to make a fool of himself as long as his act does not endanger others, and that the state may regulate the conduct of a person under pain of criminal punishment only when his actions affect the general welfare— that is, where others are harmed or likely to be harmed."

. . . .

It should be emphasized that this right is not an absolute one but, *because similar to the right of free speech, it is so important in value to society that it can be infringed upon only by the showing of a compelling state interest. If the State is able to show a compelling state interest, the right of the group will prevail over the privacy rights or the right of the individual.* However, in view of the important nature of this right, the State must use the least restrictive means should it desire to interfere with the right.
... 1 Proceedings ... at 674–75 ... (emphas[e]s added).

*Kam,* 69 Haw. at 492–93, 748 P.2d at 378 (some emphases in original and some added). The *Kam* court proceeded to cite the report of the Convention's Committee of the Whole: " '[The right to privacy] *is treated as a fundamental right subject to interference* only when a compelling state interest is demonstrated. By inserting clear and specific language regarding this right into the Constitution, your Committee intends to alleviate any possible confusion over the source of the right and the existence of it.' " *Kam,* 69

Haw. at 493, 748 P.2d at 378 (emphasis in *Kam*) (quoting 1 Proceedings at 1024). The *Kam* court then concluded that, "[b]ased on the clear and unambiguous reports, a compelling state interest must exist before the government may intrude into those certain highly personal and intimate affairs of a person's life." *Id.* (internal quotations and brackets omitted).

In sum, the plain language of article I, section 6 compels the conclusion that the right to privacy, expressly including the right to harm oneself and oneself alone, is a fundamental right, an infringement upon which must manifest more than a mere rational basis. An honest articulation of the privacy interest at stake is a prerequisite, however, to any analysis that would purport to adhere to the intent of the drafters to protect individual liberties.

C. *Rejecting The Fallacy Of Trivialization*

To frame the question at bar as whether "a decision to engage in sex for hire is a fundamental right in our scheme of ordered liberty," as did our predecessors in *Mueller,* 66 Haw. at 618, 671 P.2d at 1353–54, and as the majority appears to do in the present matter, majority opinion at 11, 155 P.3d at 1112, is to indulge in a "fallacy of trivialization," *see Mallan,* 86 Hawai'i at 498, 950 P.2d at 236 (Levinson, J., dissenting), demean the crucial role individual liberty plays in the concept of ordered liberty, and pervert the article I, section 6 framers' "intent ... to [e]nsure that privacy is treated as a fundamental right for purposes of constitutional analysis," *see* 1 Proceedings at 1024.

The United States Supreme Court, in *Lawrence,* recognized the danger of the fallacy of trivialization when it asserted that the *Bowers* Court had "misapprehended the claim of liberty" at stake by framing the question as "whether there is a fundamental right to engage in consensual sodomy." 539 U.S. at 567, 123 S.Ct. 2472. Similarly, the present case is no more about a fundamental right "to engage in sex for hire" than *Baird* was about a fundamental right to engage in sex out of wedlock. The proper question before this court, rather, is whether Romano

enjoys a fundamental right to freedom from the state's interference in, and criminalization of, her private conduct without a compelling and narrowly tailored justification. I would hold that she does indeed enjoy such a right.

### D. *The Narrow Import Of My Analysis*

The majority asserts that I argue "that a logical extension of *Lawrence* precludes the states from exercising their police power to curb prostitution." Majority opinion at 9, 155 P.3d at 1110. The majority mischaracterizes the import of my reasoning. My analysis draws a clear line between purely private behavior between consenting adults—requiring demonstration of a compelling state interest before *criminal* penalties may be imposed—and the public realm, where the state retains broad power to impose time/place/manner regulations. Adoption of my analysis by the majority, would not, therefore, compel the legalization of prostitution in its usual manifestations: streetwalking, escort services, or even hostess bars.

I merely assert that HRS § 712–1200(1), *see supra* note 1, *as applied to Romano in the present matter* is unconstitutional. Romano's prosecution and conviction reflect an extraordinarily cramped application of HRS § 712–1200(1). The uncontroverted evidence in the present matter demonstrates that Romano was held criminally accountable for wholly private, though admittedly sexual, behavior with another consenting adult. As its majority noted, *Lawrence* presupposed *private* sexual activity between two adults fully capable of giving valid consent. 539 U.S. at 578, 123 S.Ct. 2472. Neither the present matter nor *Lawrence* concerned "persons who might be injured or coerced or who are situated in relationships where consent might not be easily refused." *See id.* And, as I have emphasized, this case does not implicate public solicitation, streetwalking, or salacious advertising, which are not private activities. Rather, the present record reflects that the

charged transaction could not conceivably have hurt anybody other than Romano, which renders her conviction under HRS § 712–1200(1)—absent a showing of a compelling interest from the prosecution—a violation of her federal and state constitutional rights to privacy as articulated in *Lawrence* and by the drafters of article I, section 6.

With regard to demonstrating the necessary compelling interest, at the hearing on Romano's motion to dismiss, the prosecution did speak generally to the state's interest "in making prostitution illegal," *e.g.,* avoiding the "disruption to the marital contract," and "any sexual diseases that might get passed through promiscuous sex." However, such concerns as moral depravity, the salacious reputation of a community, and disease and their attendant impact on productivity, tourism, etc., are commonly trotted out in the name of the "general welfare," are generally speculative and attenuated, and can be moderated through "less restrictive" time, place, and manner regulations.[9] The prosecution's unelaborated theory does not constitute evidence at all, let alone proof of a compelling state interest and narrow tailoring justifying Romano's *criminal conviction.* As Justice Levinson wrote in his *Kantner* dissent, "it is self-evident that '[r]egulation and prohibition are not coextensive.'" *See generally Mallan,* 86 Hawai'i at 473–74, 496 n. 55, 498, 504, 507, 950 P.2d at 211–12, 234 n. 55, 236, 242, 245 (Levinson, J., dissenting) (quoting *Kantner,* 53 Haw. at 346, 493 P.2d at 317 (Levinson, J., dissenting)).

In light of the foregoing analysis, I would reverse the district court's August 26, 2003 judgment.

---

9. *See, e.g.,* Brothel Licence Conditions 1–5 (Prostitution Licensing Auth. (Queensl., Austl.) Sept. 12, 2003), *available at* http://www.pla.fqld.gov.au /pdfs/brothels/brothel—license—condtions.pdf [sic] ("The licensee must ...: 23.... Provide written information about sexually transmitted infections (STIs) in the client waiting area and ensure written information about STIs is available to all staff and sex workers. 24. Ensure sex workers hold a current sexual health certificate.").